## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

JOHN DOE, DMD,                               CIVIL DIVISION

               Plaintiff,          No.

     v.

UNIVERSITY OF PITTSBURGH - OF
THE COMMONWEALTH SYSTEM OF
HIGHER EDUCATION, UPMC
MEDICAL EDUCATION, and
UNIVERSITY HEALTH CENTER OF
PITTSBURGH,

          Defendants.          **JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

AND NOW, comes Plaintiff John Doe, DMD by and through counsel Robert A. Bracken, Esquire and Bracken Law Firm, LLC and files the following Complaint and avers as follows:

## <u>PARTIES AND JURISDICTION</u>

1.      Plaintiff, John Doe, DMD ("Dr. Doe") is a resident of the State of Michigan.[1]

2.      Defendant, University of Pittsburgh - of The Commonwealth System of Higher Education (the "University") is a state-related university within the Pennsylvania system of higher education with its principal place of business located at 4200 Fifth Avenue, Pittsburgh, PA 15260.

---

[1] Pseudonyms are being used throughout the Complaint for the plaintiff, accuser, and witnesses. Disclosure of Dr. Doe's name will cause irreparable harm and require the disclosure of information protected by the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C.§1232g; 34 CFR Part 99.

3.      Defendant, UPMC Medical Education is a non-profit corporation with its registered business address located at 200 Lothrop Street, Pittsburgh, PA 15213.

4.      Defendant, University Health Center of Pittsburgh is a non-profit corporation with its principal place of business located at 3600 Forbes Avenue, Forbes Tower – Suite 140, Pittsburgh, PA 15213.

5.      Plaintiff brings this action under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 et seq. ("Title IX") and Due Process clause of the Fourteenth Amendment to the U.S. Constitution brought pursuant to 42 U.S.C. § 1983 to secure all relief as may be appropriate and available.

6.      The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as well as 28 U.S.C. § 1367 for Plaintiff's pendent claims.

7.      Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Allegheny County, Pennsylvania.

**FACTUAL ALLEGATIONS**

8.      Dr. Doe is a licensed dentist who obtained his DMD in 2016.

9.      Dr. Doe was accepted into the University's Dental-General-Dental Anesthesiology Residency Program (the "Residency Program") beginning in July 2019.

***Dr. Doe's Contract with UPMC ME***

10.     As a member of the residency program, Dr. Doe signed contracts with the "University Health Center of Pittsburgh d/b/a UPMC Medical Education."

11.     On May 25, 2021, Dr. Doe and "University Health Center of Pittsburgh d/b/a UPMC Medical Education" signed a contract titled "UPMC Medical Education

Postgraduate Training Agreement" (the "Agreement") setting forth their respective obligations and duties with respect to his appointment to the Residency Program. *See* Exhibit 1.

12.     According to information from the Pennsylvania Department of State, on or about August 9, 2021, University Health Center of Pittsburgh changed its name to UPMC Medical Education.

13.     According to information from the Pennsylvania Department of State, on or about August 25, 2021, UPMC Medical Education filed the fictitious name of University Health Center of Pittsburgh.

14.     UPMC Medical Education and University Health Center of Pittsburgh shall be referred to as "UPMC ME" hereinafter.

15.     The University had knowledge of and was aware of Dr. Doe's relationship and contracts with UPMC ME.

16.      UPMC ME is described in the Agreement as "the graduate medical education (GME) sponsoring institution and managing corporate entity for various hospitals that are part of or affiliated with the UPMC system with approved residency and fellowship graduate medical education training programs . . . ."

17.     The term of the Agreement was from July 1, 2021 through June 30, 2022.

18.     Section 3 of the Agreement is titled "Termination of Agreement and Due Process."

19.     Section 3(b) of the Agreement reads: "UPMC ME may terminate this Agreement pursuant to applicable UPMC termination process including without limitation the UPMC ME Resident/Fellow Appointment, Renewal, Non-Promotion,

Remediation, Probation and Dismissal Policy. UPMC ME may terminate this Agreement with or without notice should Resident/Fellow fail to attain and retain all requirements of training; see Section 7 herein."

20.     Section 3(c) of the Agreement reads: "UPMC ME may terminate this Agreement immediately and without notice in the event Resident/Fellow Physician is charged with or convicted of a serious misdemeanor or felony or enters a plea of no contest (nolo contendere) to same, or is charged with serious misbehavior in any forum and or any type where inimical to the Residency/Fellowship Program or UPMC ME institutional standards (in the sole determination of UPMC ME leadership) before or during the term of this Agreement."

21.     Section 3(d) of the Agreement reads: "A Resident/Fellow Physician who is terminated from the Residency/Fellowship Program may request fair and reasonable review of that decision under the UPMC ME Grievance and Appeal policy."

22.     Upon information and belief, the UPMC ME Grievance and Appeal policy was not provided to Dr. Doe and is not publicly available.

### *Dr. Doe Attends an Annual Conference in Atlanta and has Consensual Sexual Relations with Jane Roe*

23.     On April 26, 2022, Dr. Doe, who was a third-year resident, traveled to Atlanta, Georgia for an annual conference, which was attended by members of the Residency Program and supervisory personnel and faculty, including the Residency Program Director.

24.     This was a University and UPMC ME sponsored or promoted trip, which provided payment for residents' flights and hotels; thus, the University and UPMC ME exercised substantial control.

25.     Among those that attended were first-year residents, including Jane Roe, S.M. and A.K.

26.     Prior to the conference Roe, as well as her friends, S.M. and A.K., had expressed disdain for Dr. Doe who was appropriately demanding of the first-year residents in his role as a third-year resident.

27.     On April 27, 2022, Dr. Doe took the American Dental Board of Anesthesiology written board examination.

28.     On April 28, 2022, Dr. Doe was seated at the hotel bar when he was approached by Jane Roe.

29.     Several other members of the Residency Program were present, including Residency Program Director.

30.     After talking and looking at Dr. Doe's phone, Dr. Doe and Roe, who were both drinking alcohol, hugged with Dr. Doe wrapping his arm around Roe's shoulder and Roe laying her head on his shoulder.

31.     Roe remained next to Dr. Doe for minutes and thereafter continued to approach Dr. Doe, touch Dr. Doe, and even place her buttocks in between Dr. Doe's legs.

32.     Later that evening, Dr. Doe and Roe were kissing in the short hallway leading to the men's room.

33.     After Roe began touching Dr. Doe's penis, they entered the men's room, continued kissing, and briefly had consensual sexual intercourse.

34.     After deciding that they should not continue having sex inside the hotel bathroom, they kissed and decided that Roe would exit first and Dr. Doe would exit a few minutes later.

35.     An older man walked towards and into the bathroom, and Roe walked past him.

36.     Roe walked from the bathroom and was not crying.

37.     Roe did not run from the bathroom.

### *Roe Falsely Accuses Dr. Doe of Rape*

38.     After she saw her friends who had a shared disdain for Dr. Doe, however, Roe allegedly began crying and accusing Dr. Doe of rape.

39.     Rather than call the police or alert hotel staff, S.M. and A.K. took Roe to the hospital.

40.     Roe stated that she wanted a "rape kit," so she could "ruin [Dr. Doe's] life."

41.     At the hospital, Roe stated that she did not want to press charges against Dr. Doe and just wanted a police report.

42.     Upon information and belief, Roe was more upset with the questions posed by the police officer at the hospital, who she referred to as a " very uneducated street cop," than she was when describing the alleged sexual assault.

### *Dr. Doe is Suspended and Roe Files a Title IX Complaint*

43.     The morning of April 29, 2022, Roe, S.M. and A.K. returned to the hotel from the hospital.

44.     That day, Roe went to the hotel pool and lounge, and showed several Residency Program members her written and revised description of the alleged sexual assault, which S.M. told her to write.

45.     Dr. Doe and Roe saw each other in the lounge without incident.

46.     On April 30, 2022, Dr. Doe was informed of rumors that had been circulating about him and Roe, and then was told by the Residency Program Director and Department Chair that he was not to return to his assigned hospital/workplace.

47.     On May 2, 2022, Samantha Cascone, Vice President of UPMC ME and Heather Reading, HR Director, contacted Dr. Doe to discuss the "events" in Atlanta before he would be approved to return to work.

48.     Dr. Doe responded by requesting that his attorney by permitted to participate and that an explanation of what he was being accused of be provided.

49.     Dr. Doe's requests were denied and, as such, Dr. Doe was compelled to participate in a meeting via video-conference that day with Cascone and Reading.

50.     On May 9, 2022, Roe filed a Title IX Complaint in which she alleged the following: (a) Dr. Doe asked Roe to come over to him after she exited the bathroom, which was about twenty feet from the bar; (b) Dr. Doe tried to kiss Roe and she said "no"; (c) Roe tried to leave and Dr. Doe grabbed her arm and dragged her into the bathroom; (d) Dr. Doe dragged her into the first bathroom stall, locked the door, shoved her head into the wall, and raped her vaginally and anally; (e) after she attempted to leave, Dr. Doe dragged her by her ponytail back into the stall and said "I'm not finished yet"; and (f) Roe shoved Dr. Doe away and ran out of the bathroom.

51.     On May 12, 2022, Reading sent Dr. Doe a letter, which reads, in relevant part:

> I am writing as a follow-up to our meeting on May 3, 2022.
> As you are, we are actively investigating a potential
> violation of UPMC policy. You were placed on paid
> administrative leave from your employment effective May
> 1, 2022 and will remain on paid administrative leave until
> the investigation is conclude or until the end of your current

contract term, June 30, 2022, whichever occurs sooner. Should the investigation not be complete by June 30th, your leave will convert to an unpaid administrative leave for the duration of the investigation. If the investigation supports a policy violation in breach of your contract, you will be subject to disciplinary action up to and including the termination of your employment.

This letter also serves as notice that you have not yet met the requirements to successfully complete your training program. If we find that your have not violated a UPMC policy, we will engage in discussions related to your path to completing those remaining requirements.

During the time of your administrative leave, you are not permitted on UPMC property except for personal medical appointments or medical emergencies or at the request of Human Resources or GME. You are also restricted from participating in any virtual component of the training program. Noncompliance with these requirements may result in additional disciplinary action.

Please be assured that UPMC will conduct this investigation as timely as is reasonably possible. Your cooperation will assist in this process. Human Resources and GME will contact you once the investigation is complete. If you need further assistance or support, the UPMC Resident and Fellow Assistance Program is also available to you. . . .

52.     The University and UPMC ME were both involved in the investigation of

Roe's Title IX Complaint against Dr. Doe.

53.     On or about June 30, 2022, Dr. Doe was placed on unpaid administrative

leave and would remain there for approximately fourteen (14) months.

***Defendants' History of Bias and Opposition to Title IX Protections for those Accused of Sexual Misconduct by "Survivors"***

54.     On April 4, 2011, the Department of Education's Office for Civil Rights

("OCR") issued a guidance letter to universities receiving federal funding, which became

widely known as the "Dear Colleague Letter" (the "DCL").

55.     The OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.

56.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" and focus on victim advocacy.

57.     The DCL discouraged cross-examination by the parties and suggested that to recognize a right to cross examination might violate Title IX.

58.     Although a mere guidance letter, the OCR treated the DCL as a binding regulation and pressured universities to aggressively pursue investigations of sexual assault on campus.

59.     After the DCL was published, schools changed their sexual assault and sexual harassment policies and procedures.

60.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

61.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators and conducted hundreds of investigations of colleges for the potential mishandling of complaints of sexual misconduct.

62.     The threat of revoking federal funds was a powerful tool in motivating colleges to aggressively pursue and punish males accused of sexual misconduct.

63.     Colleges, universities, and teaching hospitals, including Defendants, were fearful of, and concerned about, being investigated, or sanctioned by the U.S. Department of Education ("DOE") and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ"). In response to pressure from the federal government, educational institutions, like Defendants, limited the procedural protections afforded to males, like Dr. Doe, in sexual misconduct cases.

64.     On September 7, 2017, Betsy DeVos, the U.S. Secretary of Education, announced that the "Rule by [the 2011] Letter is over." In a public address she expressed concerns raised by members of academia that the approach pushed by the U.S. Department of Education for the previous several years exerted improper pressure on universities to adopt Title IX procedures that do not afford fundamental fairness to all students. Secretary DeVos advised that she thought the professors who raised these concerns were right and described the system as failed and one that imposed policy without even the most basic safeguards.

65.     On September 22, 2017, the OCR formally rescinded the DCL and put in place interim guidance (the "2017 Q&A"), as the DCL, which may have been well intentioned, had led to the deprivation of fair process to accused students.

66.     Among other things, the 2017 Q&A prohibited universities from relying on assumptions that favored complainants over respondents and required investigators to "synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case."

67.     On November 16, 2018, the DOE proposed further rules to address the lack of basic elements of due process and fundamental fairness.

68.     The proposed rules would require schools to operate with the presumption of innocence of the accused throughout the investigation and grievance process.

69.     It would require written notice of allegations and an equal opportunity to review all evidence collected for both parties.

70.     It would require the right to cross-examination, subject to certain protections, and a live hearing where cross-examination would be conducted through the parties' advisors.

71.     To promote impartial decisions, schools would be prohibited from using a "single investigator" or "investigator-only" model.

72.     Defendants opposed these proposed mechanisms for providing accused (predominantly male) students with due process protection and, instead, sought to continue with a process that favored the (predominantly female) students asserting complaints.

73.     On January 30, 2019, the University's Chancellor Patrick Gallagher sent a letter to the U.S. Department of Education, which reads:

> As Chancellor of the University of Pittsburgh, I am grateful for the opportunity to comment following the Department of Education's notice of proposed rulemaking on Title IX, which the Department issued on November 29, 2018.
>
> Pitt is a member of the Association of American Universities (AAU) and one of the nation's premier public institutions for higher education and research. Our five-campus community spans more than 34,000 students as well as 13,000 faculty and staff members who are actively engaged in extending our institution's proud legacy of leveraging knowledge for society's gain.
>
> The University is—and will continue to be—steadfast in our commitment to providing a learning environment that is free from sexual misconduct, harassment and

discrimination. We are equally committed to promoting fairness and equity. Consequently, we are submitting this comment out of concern that some of the proposed rules may impede us from sufficiently supporting these values.

Organizations such as the AAU and the Association of Independent Colleges and Universities in Massachusetts (AICUM) have articulated important issues and concerns in their public comments that strongly align with our institution's concerns about the proposed regulations. However, I would like to take this opportunity to emphasize and amplify certain points covered in those public comments that are particularly important to the University of Pittsburgh:

- We request that the Department revisit the imposition of a prescriptive quasi-judicial process for sexual harassment allegations, such as requiring hearings, cross-examination and evidentiary rulings. These proposed changes have the potential to dissuade all parties, including witnesses, from engaging in the Title IX process. As addressed in the AAU and AICUM comments, these changes also intrude on existing internal processes and do not take into consideration a trauma-informed approach.

- We request that the Department revisit its proposed language limiting the scope of Title IX protections based on the geographic location of an alleged incident. This language could lead community members to incorrectly believe that a school cannot address off-campus activities that impact its educational or employment environment, despite that institution's capacity and—in some cases—duty to do so. As a result, this proposed language could have a chilling effect on individuals who are contemplating coming forward.

- We request that the Department reconsider its proposed narrowed definition of sexual harassment to allow, instead, for a definition consistent with institutions' commitment and obligation to effectively prohibit discrimination in the educational and employment environment. We understand that the proposed regulation will not

limit our ability to respond to all conduct currently included within the definition of sexual harassment, even if that conduct is excluded from the new definition. Nonetheless, we believe that the Department's proposed definition of sexual harassment has the potential to sow confusion and reduce reporting out of concern that an allegation does not fall within this more restricted classification.

• We request that the Department consider supplementing the proposed rules to clarify the relationship between Title VII and Title IX. As currently written, these rules could be construed to create conflicting rights based solely on the status of the party within the University or the specific form of discrimination alleged.

With these requests, the University of Pittsburgh joins a growing chorus of institutions and organizations that are urging the Department to revisit and revise its proposed regulations to provide institutions with additional flexibility to address sexual harassment in their individual communities. We believe that if executed as currently proposed, the Department's regulations have the potential to adversely affect the higher education landscape in direct, diverse and consequential ways. As a result, I appreciate this opportunity to articulate our institution's values, share our perspective on this important issue and submit a formal comment requesting revisions of the proposed regulations.

74.     On May 6, 2020, the DOE released new Title IX regulations, which became effective on August 14, 2020 ("2020 Title IX regulations").

75.     The 2020 Title IX regulations, which were in effect at the time of the consensual sexual relations between Dr. Doe and Roe and throughout the investigation of Roe's Title IX Complaint against Dr. Doe, mandated that a respondent be afforded procedural rights, including but not limited to a live-hearing and the opportunity to cross-examine in post-secondary institutions.

76.     Respondents, such as Dr. Doe, were to be treated equitably by not imposing disciplinary sanctions without following the grievance process prescribed by Title IX.

77.     The 2020 Title IX regulations required an objective evaluation of all relevant evidence, inculpatory and exculpatory, and the avoidance of credibility determinations based on a person's status as complainant, respondent, or witness.

78.     The 2020 Title IX regulations required that all personnel involved, including investigators and decision-makers, be free of bias for or against complainants and respondents.

79.     The 2020 Title IX regulations mandated that schools not restrict the parties' ability to discuss or obtain evidence.

80.     The 2020 Title IX regulations provide that charging an individual with code of conduct violations that do not involve sexual harassment, but arise out of the same facts or circumstances as a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by Title IX constitutes retaliation.

81.     The 2020 Title IX regulations require schools to keep the identity of complainants, respondents, and witnesses confidential.

82.     As a result of the enactment of the 2020 Title IX regulations, the University was required to implement a revised Title IX Policy, which became effective August 14, 2020 that applied to "allegations that constitute Sexual Harassment (as defined by Title IX)." *See* Exhibit 2.

14

83.     While the University acknowledged that Title IX was federal law, the

prevention and education coordinator at the University's Sexual Violence Prevention

Office, which was created just months earlier, called them problematic and stated that the

changes would not stop the Title IX office from providing services to survivors.

84.     The Title IX Policy defined "Sexual Harassment" as follows:

> Conduct on the basis of sex occurring in the United States
> and occurring in or related to a University Education
> Program or Activity that satisfies one or more of the
> following: (1) An employee of the University conditioning
> the provision of an aid, benefit, or service of the University
> on an individual's participation in unwelcome sexual
> conduct; (2) Unwelcome conduct determined by a
> reasonable person to be so severe, pervasive, and
> objectively offensive that it effectively denies a person
> equal access to the University's Education Program or
> Activity; or (3) Sexual assault, dating violence, domestic
> violence, or stalking.

Exhibit 2.

85.     The Title IX Policy defines the "Formal Grievance Process" for a Title IX

Complaint as follows:

> If the matter proceeds through the Formal Grievance
> Process, the University will investigate and adjudicate the
> matter consistent with the process outlined in Procedure CS
> 27. An Investigator will be assigned and will be responsible
> for investigating the Formal Complaint and completing an
> Investigative Report that fairly summarizes the relevant
> evidence. At this point the parties will have the opportunity
> to review and respond in writing. Upon finalization of the
> report, the matter will proceed to a live hearing (whether
> in-person or virtually), which is overseen by a Decision-
> Maker, who will make a determination as to whether the
> Respondent is responsible for violating this Policy.
> Procedure CS 27 provides details regarding this hearing.
>
> The Decision-Maker will reach this determination, only
> after completing an objective evaluation of all relevant
> evidence. Parties will be notified of the Decision-Maker's

determination consistent with the process provided in
Procedure CS 27.

*Id.*

86.     Procedure CS 27, which also took effect on August 14, 2020, details the

process for responding to a formal complaint of sexual harassment, informal resolution,

and the formal grievance process. *See* Exhibit 3.

87.     As part of the formal grievance process, Procedure CS 27 confirms that (a)

the investigator's role is prepare a report summarizing the allegations and not to be the

decision-maker, (b) a live hearing shall be conducted, (c) cross-examination by the

parties' advisors is permitted, and (d) a determination of responsibility shall be made by

the decision-maker present at the live hearing. *Id.*

88.     The University also revised its separate Sexual Misconduct Policy, which

also became effective August 14, 2020. *See* Exhibit 4.

89.     The Sexual Misconduct Policy stated that it is applied to conduct that did

not constitute "Sexual Harassment," as defined in its Title IX Policy.

90.     All conduct that constituted Sexual Harassment was supposed to be

addressed in accordance with the Title IX Policy.

91.     The Sexual Misconduct Policy and the procedures set forth in Procedure

CS 20 and the Student Code of Conduct for allegations of sexual misconduct that do not

meet the definition of "Sexual Harassment" failed to provide the due process protections

provided by the revisions to Title IX, such as a live hearing, the opportunity for cross-

examination, and the prohibition of a sole investigator. *See* Exhibits 4, 5 and 6.

92.     Those policies, however, confirm that allegations that meet the definition

of "Sexual Harassment" must be addressed in accordance with the Title IX policy. *Id.*

16

93.     As direct evidence of bias in favor of the complaint, the Sexual Misconduct Policy refers to complainants as "survivors" and CS 20 refers to complainants as the "victims" and refers to the respondents as the "accused."

94.     In early October 2020, the University was under pressure from students who had been protesting about alleged sexual assaults on campus and demanding that the University, including the Title IX Office, act.

95.     On October 22, 2020, the University's Sexual Violence Prevention and Education Office hosted a discussion featuring faculty, including those with the Title IX and Diversity and Inclusion Offices, titled "Unpacking the New Title IX Regulations."

96.     The panelists stated that President Barack Obama's administration had strengthened enforcement of Title IX through the DCL and that the President Donald Trump's administration had a counter-narrative addressing accused students that claimed to have been "railroaded."

97.     Throughout the discussion, complainants were often referred to as "survivors."

98.     One panelist stated: "knowing the survivors are encountering live hearings and live cross-examination brings elements of criminal justice system that are the most traumatizing and most victim blaming into the Title IX process."

99.     One University professor acknowledged that referring to complainants as "survivors" could be viewed as indicative of gender bias against males.

100.    In the fall of 2022 and into the spring of 2023, the University and its Title IX Office helped plan and participated in "The Pittsburgh Universities Believe Survivors March" held on April 16, 2023.

101.    The University promoted this event and shared the hashtag

#BelieveSurvivors.

102.     Despite recognizing the existence of the mandatory Title IX protections,

Defendants have utilized the Sexual Misconduct Policy and its unfair, DCL-based

process improperly in instances, such as the Title IX Complaint filed by Roe against Dr.

Doe in which the allegations met the definition of "Sexual Harassment."

### Dr. Doe is Subjected to a Biased and Unlawful Investigation

103.    The University and/or UPMC ME assigned Joseph L. Bielevicz,

Investigator with the University of Pittsburgh's Office of Compliance, Investigations and

Ethics to investigate Roe's Complaint.

104.    On October 19, 2022, Investigator Bielevicz sent Dr. Doe an email, the

first paragraph of which reads:

> Under the University's Sexual Misconduct Policy, the next
> step in the process is the evidence review process. Both
> parties get to see all statements, documents, texts, etc. and
> you are permitted to respond to any statement or item of
> evidence if you feel the need to do so. You will have 10
> business days to do this, after which the final report will be
> completed and a conclusion will be reached.

105.    The investigation was inappropriately conducted pursuant to the Sexual

Misconduct Policy and Student Code of Conduct rather than the Title IX Policy even

though the allegations in Roe's Title IX Complaint met the definition of "Sexual

Harassment."

106.    Dr. Doe was subject to a biased, unfair sole-investigator process and

denied his due process rights and protections, including his rights to a live hearing and an

opportunity to cross-examine Roe and other witnesses.

107.    In or about March 2023, Investigator Bielevicz issued a report finding Roe's allegation that Dr. Doe forced her into a hotel men's room where he engaged in forcible intercourse was more likely than not true.

108.    The investigation continued for a year, as Defendants hoped that the Fulton County, Georgia District Attorney's Office would provide cover to their preordained decision to favor the female accuser and punish the accused male.

109.    The District Attorney, however, declined to bring charges against Dr. Doe.

110.    Upon information and belief, the District Attorney's decision was made based upon the same evidence available to Defendants during the investigation of Roe's Title IX Complaint and the credibility (or lack thereof) of the individual(s) involved in the allegations.

111.    Investigator Bielevicz's analysis and conclusion were not merely flawed, but they reeked of bias against the accused male and several examples follow; however, to be clear, this is not a complete list of all the evidentiary inconsistencies and examples of bias against Dr. Doe.

### a. Roe and Dr. Doe's Initial Embrace

112.    Roe, upon information and belief, told Investigator Bielevicz that she saw Dr. Doe at the opposite side of the bar staring at the ground, approached him and asked if he was okay.  After they conversed, Roe told the investigator that Dr. Doe asked for a hug and then, when Roe hugged him, Dr. Doe "grabbed her buttocks." Roe stated that she was angry and then walked away.

113.    The surveillance video unequivocally establishes that Roe's statement was false.

19

114.    Surveillance video showed Roe and Dr. Doe hug, with Dr. Doe's arm on her <u>shoulder</u> and Roe laying her head on Dr. Doe's shoulder while remaining next to Dr. Doe for several <u>minutes</u> thereafter.

115.    In fact, surveillance video showed Roe approach and touch Dr. Doe multiple times, including after they hugged.

116.    Because it was not supportive of the female accuser, Investigator Bielevicz chose to not cite the surveillance video evidence that contradicted Roe's story.

### b. Roe and Dr. Doe's Interaction Immediately Before Entering the Men's Restroom

117.    Roe, upon information and belief, told the police officer at the hospital and wrote in her revised written statement that (a) after she exited the bathroom, she saw Dr. Doe who asked her to come towards her after he took a few steps behind the wall towards the men's restroom, (b) Dr. Doe said she was being a flirt, (c) Roe responded by stating she was just being nice because Dr. Doe looked sad and pathetic, (d) Dr. Doe suddenly kissed her, (e) Roe said "no" and started to walk back to the bar, and (f) Dr. Doe grabbed her left arm and dragged her towards the men's restroom.

118.    Roe, upon information and belief, told Investigator Bielevicz that (a) after she exited the bathroom, she saw Dr. Doe who asked her to come towards her after he took a few steps behind the wall towards the men's restroom, (b) Dr. Doe said she was being a flirt, (c) Roe responded by stating she was just being nice because Dr. Doe looked sad and pathetic, (d) Dr. Doe suddenly kissed her and put his hand under her dress and underwear, (e) Roe pulled away and tried to flee, and (f) Dr. Doe grabbed her left arm and despite her grabbing the "corner guard" of the wall, pulled her into the men's room.

119.    The surveillance video refutes Roe's story.

120.    The surveillance video shows Roe exit the women's room and walk down the hallway towards the bar.

121.    The surveillance video shows Dr. Doe and Roe walk back down the hallway together towards the restrooms.

122.    The surveillance video shows Dr. Doe stop and Roe walk up to him, inches from his face and touch his shoulder.

123.    The surveillance video shows Dr. Doe then walk towards the very short hallway towards the men's room, which is out of camera view.

124.    The surveillance video shows Roe then walk towards Dr. Doe out of camera view.

125.    There was enough room in the short hallway for Dr. Doe and Roe to embrace and kiss while remaining out of camera view.

126.    Had Roe started walking back to the bar or attempted to flee, however, that would have been seen on the camera, but it was not.

127.    Because it was not supportive of the female accuser, Investigator Bielevicz chose to not cite the inconsistencies between Roe's stories to him and the police, and in her revised written statement.

128.    Because it was not supportive of the female accuser, Investigator Bielevicz chose not cite the surveillance video evidence that refuted several parts of Roe's story.

129.    Instead, Investigator Bielevicz cited the surveillance video in his attack on Dr. Doe's credibility because it did not show Dr. Doe and Roe embracing before entering the men's room.

130.     But, this would have been out-of-camera view in the short hall way leading to the men's room.

131.     Again, while there was plenty of room for two people to physically embrace and remain out of camera view, someone "fleeing" towards the bar would have been seen on camera.

### c.   Roe and Dr. Doe's Sexual Encounter in the Restroom

132.     Roe, upon information and belief, provided various stories with changing details about what happened inside the men's room to the police officer, in her revised written statement and in her interviews with Investigator Bielevicz, yet these were inconsistencies were ignored.

133.     For example, Roe, upon information and belief, claimed that Dr. Doe slammed her head against a tile wall.

134.     Roe, however, had no bruises or marks on her face.

135.     Because it was not supportive of the female accuser, Investigator Bielevicz chose to ignore this inconsistency in making his findings to favor the female accuser.

136.     Roe, upon information and belief, claimed that she escaped by pushing Dr. Doe over a toilet, ran out of the stall, and burst out the bathroom door.

137.     In her Title IX Complaint, Roe stated that she ran out of the bathroom.

138.     Surveillance video, however, showed Roe simply walking back towards the bar.

139.    Because it was not supportive of the female accuser, Investigator Bielevicz chose to ignore this inconsistency in making his findings to favor the female accuser.

### d.  Roe's Alcohol Consumption

140.    Roe, upon information and belief, told the police officer at the hospital that she was "pretty drunk."

141.    Roe, upon information and belief, noted in her written, revised statement that Dr. Doe bought her a shot and multiple drinks and pressured her to keep drinking when she said that she did not want anymore.

142.    Roe, upon information and belief, told Investigator Bielevicz that she merely drank two glasses of wine and one shot that Dr. Doe pressured her to drink.

143.    Surveillance video does not support, in any way, that Dr. Doe pressured Roe to drink.

144.    Because it was not supportive of the female accuser, Investigator Bielevicz chose not cite the evidence Roe's changing stories about her alcohol consumption or the evidence that contradicted Roe's statements.

### e.  Evidence Not Considered

145.    Several witnesses, upon information and belief, told Investigator Bielevicz that Roe had been sitting on Dr. Doe's lap at the bar and the lap of other men that evening as well.

146.    Investigator Bielevicz stated that these observations would not be considered, yet explicitly chose to consider only those hearsay statements that were

allegedly made by Roe to her friends that Dr. Doe was being "handsy" and she "wanted him to stop."

147.    Because the observations were not supportive of the female accuser, Investigator Bielevicz chose not consider them and, instead, only chose to consider hearsay statements that were beneficial to the female accuser.

**f.  Roe's Friend, S.M.**

148.    Investigator Bielevicz even chose to credit the statements of S.M. about what she claimed Roe told her.

149.    During the investigation, upon information and belief, S.M. accosted a graduate of the Residency Program, A.H. after S.M. saw notes of A.H.'s interview with Dr. Doe's attorneys, which S.M. claimed to receive from the University's Title IX Office.

150.    Title IX mandates that witness identities be maintained confidentially, but A.H.'s was not.

151.    Upon information and belief, during the confrontation, S.M. admitted that she had lied to the Title IX investigators to support Roe and insisted that A.H. should do that same rather than "slut-shaming" Roe.

152.    When interviewing A.H. who described her observations of Roe's pattern of flirtatious and sexualized behavior towards Dr. Doe and others, Investigator Bielevicz felt the need to note that although this witness "reported that she believed herself to be an unbiased witness . . . she was consistently dismissive of [Roe's] allegations."

153.    Investigator Bielevicz considered any witness that did not agree with Roe's demonstrably false allegations against Dr. Doe to be "biased."

154.    Indeed, when interviewing S.M. about the confrontation with this witness, Investigator Bielevicz noted that she said she believes Dr. Doe assaulted Roe, yet chose not to comment on whether she was biased and instead credited her statements.

### g.  Frivolous Attacks on Dr. Doe's Credibility

155.    The Residency Program Director was present at the hotel bar the night of April 28 at the same time Dr. Doe, Roe and other Residency Program members were present.

156.    The Residency Program Director told Investigator Bielevicz that he recalled Dr. Doe sitting across from him, but "did not recall" Dr. Doe ever sitting two seats away or any interactions between Dr. Doe and Roe.

157.    Investigator Bielevicz noted that a review of video surveillance "confirmed" that Dr. Cuddy was not seated near Dr. Doe, as he claimed.

158.    The surveillance video, however, showed a very small portion of the bar and the heads of those people sitting merely two seats from one spot in which Dr. Doe was present in the bar could not be seen and the other spots of the bar could not be seen either.

159.    Nevertheless, Investigator Bielevicz cited this inconsistency – the location of the Residency Program Director's seat at the bar – as a basis for his credibility decisions.

160.    Also frivolous, no witness claimed that Dr. Doe waived to Roe the following day while she was at the hotel lounge, yet because Investigator Bielevicz claimed that Dr. Doe had allegedly said he did (even though Dr. Doe denied ever making

this statement to Investigator Bielevicz), this irrelevant fact was used as a basis for questioning Dr. Doe's credibility.

161.     Investigator Bielevicz sought to find even the most minor inconsistency to attack Dr. Doe's credibility to justify a finding in favor of Roe.

162.     Investigator Bielevicz ignored significant, material inconsistencies in Roe's statements.

163.     Investigator Bielevicz refused to consider significant exculpatory evidence.

164.     The investigator also included several paragraphs describing accusations made by Roe, S.M. and A.K. about Dr. Doe inappropriately touching women prior to April 28, 2022 on the University and/or UPMC ME's premises, yet dropped a footnote stating that he did not "rely on this information in reaching a conclusion" and was "included in the interest of providing the witness' complete statement."

165.     There was no evidence to support any of these false allegations, yet they were included solely to disparage Dr. Doe.

166.     While the investigator felt compelled to include this disparaging and false information about Dr. Doe in the interest of providing the "complete" witness statements, the investigator intentionally chose to ignore the relevant information, such as the surveillance video, which demonstrated Roe's lack of credibility and the falsity of her allegations.

**h.  Defendants' Interference with Dr. Doe's Defense**

167.     Defendants took other biased, discriminatory actions to the detriment of Dr. Doe during the investigation as well.

168.    For example, upon information and belief, UPMC ME and/or University officials advised witnesses to not speak with Dr. Doe's lawyers.

***Dr. Doe is Dismissed from the Residency Program and Banned from the University***

169.    On July 17, 2023, UPMC ME HR Director Heather Reading sent Dr. Doe a letter noting that he had been on unpaid administrative leave for twelve months and that UPMC ME can "no longer continue your leave."

170.    Ms. Reading wrote that because Dr. Doe had not yet completed the training program, he was being offered three (3) options: "Receive a certificate for partial completion of your training program marking the end of your employment with University Health Center of Pittsburgh"; "Request that the program provide justification to petition for a waiver of your remaining rotation to complete the program"; or "Re-apply to the program to complete your remaining rotation."

171.    On Jul 25, 2023, Dr. Doe provided justification in support of his request that the program waive the remaining rotation per option (b).

172.    Dr. Doe completed and surpassed the case number required for graduation from the UPMC ME program.

173.    Dr. Doe passed the written national board examination.

174.    At the time of his dismissal, Dr. Doe had only 7 weeks of the 36-month residency left to finish.

175.    Yet, UPMC ME refused to provide him with a certificate of completion.

176.    In fact, UPMC ME failed to even respond to his July 25, 2023 request that he be provided a certificate of competition.

177.   In August 2022, Dr. Doe was informed that he had been emailed (to a

pitt.edu email address that he did not use) a letter dated April 6, 2023 from Kenyon R.

Bonner, Vice Provost of Student Affairs, which reads, in relevant part:

> The University has conducted a thorough, neutral, fact-finding investigation of a Title IX complaint from April 28, 2022, where you were named as the Respondent. In accordance with Chapter 6 of the Student Code of Conduct (Code), I have reviewed the University's Investigative Report (Report) of the following alleged violation of the Code:
>
> 13. Violates the University of Pittsburgh Sexual Misconduct Policy including, but not limited to:
>
> a. Sexual Assault
>
> Based upon a preponderance of the evidence, you have been found responsible for violating the above-referenced violation of the Code. Having been found responsible and upon my review of the Report, I have determined that your sanction(s) will be as follows:
>
> - You are dismissed from the University of Pittsburgh, effective April 6, 2023. A disciplinary dismissal is defined as a permanent separation of the Student from the University, its programs and facilities. Upon Dismissal, the Student is placed on Persona Non Grata status from all University Property and is not permitted to enter or use University Property unless the Student receives permission from the Vice Provost for Student Affairs or their designee. In accordance with University Policy 09-05-08, there may be no financial adjustment made to tuition or fee charges for Students who are Disciplinarily Suspended/Dismissed.
>
> You have until 5:00pm April 19, 2023 to submit a petition for the postponement of sanctions pending appeal and a separate petition for appeal with the University Review Board. Information regarding the appeals process can be found in the Code at conduct.pitt.edu. To begin this

> process, please please [sic] contact the University Review
> Board Moderator at . . . .
>
> To discuss the potential implications of the sanction(s) may
> have on your academic progress, contact the Dean's office
> of your academic program. To discuss the potential
> financial implications of the sanction(s) may have, contact
> the Office of Admissions and Financial Aid at . . . .
>
> If you require additional information or assistance, please
> feel free to contact me at . . . .

178.    The letter was not mailed to John Doe or sent to his attorney.

179.    Thus, this letter dismissing Dr. Doe from the Residency Program and barring him from the campus, was sent at the same time that the Title IX Office and various administrators and officers of Defendants were preparing for and participating in "The Pittsburgh Universities Believe Survivors March."

180.    The Title IX investigation was pending for more than fourteen (14) months before John Doe was notified of the decision.

181.    On or about October 3, 2023, the University Review Board issued a decision denying Dr. Doe's appeal.

182.    Dr. Doe has suffered substantial harm and damages as a result of Defendants' conduct.

### COUNT I - Violations of Title IX of the Education Amendments of 1972

183.    Plaintiff incorporates Paragraphs 1 through 182 as if fully set forth at length herein.

184.    Title IX provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be
> excluded from participation in, be denied the benefits of, or
> be subjected to discrimination under any education
> program or activity receiving Federal financial assistance.

185.    The Residency Program is an "educational program" under Title IX.

186.    Defendants receive federal funding.

187.    Title IX prohibits sex discrimination against employees of universities and educational programs that receive federal funding- its protections are not limited to students.

188.    As held by the Third Circuit in Doe v. University of Sciences, 961 F.3d 203, 209 (2020), "...to state a claim under Title IX, the alleged facts ... must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."

189.    Many specific facts demonstrating a plausible inference of Defendants' discrimination against Dr. Doe due to his sex have been detailed throughout the Complaint.

190.    Defendants conducted a flawed, superficial and gender-biased proceeding against Dr. Doe.

191.    Defendants failed to provide a reasonably prompt investigation and process.

192.    Defendants yielded to external pressure when implementing and imposing the Sexual Misconduct policy and applying it when investigating and making a decision with respect to Roe's Title IX Complaint against Dr. Doe.

193.    Defendants yielded to external pressure when rendering a decision in Roe's Title IX Complaint against Dr. Doe.

194.    Defendants did not confidentially maintain the identity of a witness.

195. Defendants reviewed all evidence and drew all inferences, including demonstrably false and unreasonable inferences, in favor of the female, Roe, and against the male, Dr. Doe.

196. Defendants failed to afford Dr. Doe a presumption of innocence.

197. Defendants ignored exculpatory evidence and Roe's inconsistencies and lack of credibility.

198. Defendants deprived Dr. Doe his due process rights.

199. Defendants deprived Dr. Doe of his rights required by Title IX, including but not limited to the right to a live hearing and opportunity to cross-examine Roe and witnesses.

200. The circumstances described above suggest that gender-bias was a motivating factor in the inconsistent treatment of Jane Roe and Dr. Doe.

201. Dr. Doe was discriminated against on the basis of his sex.

202. Upon information and belief, as compared to the number of females accused of sexual misconduct, the number of males whose cases are formally investigated and adjudicated is greater.

203. Upon information and belief, females accused of sexual misconduct were issues less severe sanctions than those issued to comparable male respondents.

204. Charging Dr. Doe with code of conduct violations that arose out of the same facts Roe's formal complaint of sexual harassment was done for the purpose of interfering with Dr. Doe's right or privilege secured by Title IX and constitutes retaliation in violation of Title IX.

205.    As a result of the foregoing, Plaintiff is entitled to a judgment against Defendants awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, all available compensatory and monetary damages, equitable relief, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of income, lost career opportunities, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against Defendants enjoining violations of Title IX in the process of investigating and adjudicating sexual harassment and misconduct complaints, expunging Plaintiff's records, requiring Defendants to destroy all documents and records concerning Roe's complaint and the corresponding investigation, requiring Defendants to remove any record of the investigation of Roe's complaint and Roe's complaint from Plaintiff's file, and reinstating Plaintiff residency, appointment and contract.

## COUNT II - Violations of the Fourteenth Amendment of the United States Constitution brought pursuant to 42 U.S.C. § 1983

206.    Plaintiff incorporates by reference herein Paragraphs 1 through 205 of the Complaint as if more fully set forth at length herein.

207.    Defendants are state actors.

208.    Pursuant to the Fourteenth Amendment, state actors cannot deprive a person of his life, liberty or property without due process of law.

209.    Plaintiff possessed a property interest as a student and member of the Residency Program, as well as a liberty interest in his reputation.

210.    Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between Defendants and Plaintiff.

211.    It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

212.    At all times relevant, the investigation of Roe's Title IX Complaint and the decisions that followed were carried out and made by state actors or actors acting under the color of law.

213.    Defendants violated Plaintiff's due process rights in the following particulars, which include but are not limited to the following: (a) not undertaking a neutral and objective fact finding; (b) not affording Plaintiff his rights under the Title IX provisions in effect at the relevant time; (c) not providing Plaintiff with a live hearing; (d) not providing Plaintiff with an opportunity to cross-examine Roe and other witnesses; (e) subjecting Plaintiff to the sole-investigator model; (f) breaching confidentiality; (g) interfering with Plaintiff's defense; (h) not considering exculpatory evidence or the inconsistencies of Roe's stories; and (i) not providing him an opportunity to be heard by an impartial factfinder.

214.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer damages, including but not limited to, diminished education opportunities, lost past and future income, humiliation, embarrassment, and mental anguish.

215.    Plaintiff is entitled to all available damages, including but not limited to economic and monetary damages, compensatory damages, attorney's fees and costs.

## COUNT III – Breach of Contract

216.    Plaintiff incorporates by reference herein Paragraphs 1 through 215 of the Complaint as if more fully set forth at length herein.

217.    Under Pennsylvania law, to allege breach of contract, a Plaintiff must allege (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages.

218.    Dr. Doe had a contract with UPMC ME. Exhibit 1.

219.    Dr. Doe paid his tuition and, resultantly, the following policies constituted contracts: (a) Title IX Policy and Procedure; (b) Sexual Misconduct Policy and Procedure; and (c) Student Code of Conduct. Exhibits 2-6.

220.    Under Pennsylvania law, contracts contain an implied covenant of good faith and fair dealing, which Defendants violated.

221.    Defendants breached these contracts and the implied covenant of good faith and fair dealing.

222.    Defendants breaches of these contracts include but are not limited to: (a) the failure to use the Title IX formal grievance process; (b) deprive Plaintiff of his due process rights; (c) fail to maintain confidentiality; (d) fail to provide Plaintiff with a fair and equitable process; (e) discriminate against Plaintiff; and (f) dismiss Plaintiff from the Residency Program and ban him from the University.

223.    Plaintiff has suffered and will continue to suffer substantial actual, economic and consequential damages and losses as a result of the direct, proximate, and foreseeable consequence of the foregoing breaches.

224.    As a result of the foregoing, Plaintiff is entitled to all available damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT IV – Intentional Interference with Existing and Prospective Economic Advantage

225.    Plaintiff incorporates by reference herein Paragraphs 1 through 224 of the Complaint as if more fully set forth at length herein.

226.    Plaintiff had an existing contractual relationship with UPMC ME.

227.    Plaintiff had also been offered a contract with Great Lakes Ambulatory Anesthesia ("GLAA"), which would have been effective upon his completion of the Residency Program.

228.    Defendants knew of the existence of these contractual and prospective relationships.

229.    The University acted with the intent of harming Plaintiff's relationship with UPMC ME.

230.    Defendants acted with the intent of harming Plaintiff's prospective relationship with GLAA.

231.    Defendants knew that interference with these relationships was certain or substantially certain to occur because of their actions and/or omissions, which are described at length in the Complaint.

232.    Plaintiff has been damaged as a result and is seeking all available compensatory, economic, and equitable relief available.

233.    Defendants' actions were intentional and/or performed with reckless indifference to Plaintiff's rights.

234.    Accordingly, punitive damages are warranted.

**JURY TRIAL DEMANDED**

**BRACKEN LAW FIRM, LLC**

By _____
Robert A. Bracken
PA ID 206095
101 Smithfield Street
Suite 100
Pittsburgh, PA 15222
*Counsel for Plaintiff*